## Manuel, et al. v. Haselden, et al.

(Decided January 23, 1925.)

### Appeal from Garrard Circuit Court.

1. Vendor and Purchaser—Purchasers who have Not been Evicted Cannot Defend Action on Purchase Money Notes on Ground of Breach of Warranty.—Purchasers cannot defend action on purchase money notes on ground of alleged defective title violative of warranty contained in deed, where there has been no eviction.

2. Vendor and Purchaser—Evidence Held to Sustain Finding that Vendors Did Not Expressly Agree that Purchasers Could Rescind if Title Turned Out Imperfect.—Evidence held to sustain finding that vendors have right to rescind if title should turn out to be imperfect.,

3. Vendor and Purchaser—Purchasers Could Not Rely on Misrepresentation as to Name of Mortgagee where Papers Executed to them Disclosed Real Mortgagee.—Purchasers could not rely on misrepresentation as to name of mortgagee, in defense of action on purchase money notes, where papers executed to purchasers contained name of mortgagee.

4. Auctions and Auctioneers—Bidding Pursuant to Agreement with Joint Owner to Purchase Property Jointly Did Not Invalidate Sale to Other Bidder.—Where one of three joint owners of land sold at public auction entered into agreement with bidder, to which other joint owners did not consent, to purchase land jointly with bidder for price not in excess of certain amount, the bidding by such bidder was not such by-bidding as to invalidate sale to another bidder.

ROBINSON & KAUFFMAN for appellants.

L. L. WALKER and G. C. WALKER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On and prior to October 1, 1919, appellees and plaintiffs below, J. R., S. G. and J. S. Haselden, were the joint owners of a tract of land in Garrard county containing about 80½ acres. For the purpose of dividing it among the owners, they advertised its sale at public auction on the premises to be held on the date mentioned, and at that sale the appellants and defendants below, J. T. Manuel and wife, Fannie Manuel, became the purchasers at the price of $240.00 per acre. On the next day they executed a written contract to purchase the land on the terms stated therein, which were the payment of $6,-400.00 in cash, the assumption of the balance of a prior mortgage amounting to about $3,500.00, and the execution of three notes for one-third of the balance payable in one, two and three years from and after January 1, 1920, at which time the vendors agreed to and did execute a deed. A lien was retained to secure the deferred payments and each note as well as the deed contained a precipitory clause whereby the entire indebtedness would become due upon the failure to pay any note or interest when due. The second and third notes were pledged to different banks, and after the first one matured and neither it nor the interest was paid, plaintiffs filed suit to collect it and also to declare the other two notes due and made the holders thereof parties. The petition also sought to foreclose the lien on the land in payment of whatever judgment was rendered. The holders of the other notes answered and by way of cross-petition sought the same relief.

The answer defended upon two grounds, (1), that the vendors on the day of the sale and on the next day when the contract was executed falsely and fraudulently represented that the title to the land was perfect and that it subsequently developed not to be so, and if not so then the purchaser would have the right to demand and receive a rescission; and (2), that the vendors procured a by-bidder at the sale who actually bid upon the land and ran it up on the defendants, which it was alleged rendered the sale at least voidable at the option of defendants, which option they sought to exercise. Those defenses were put in issue and after quite extensive preparation the cause was submitted to the court, who rendered judgment sustaining the prayer of the petition and those of the cross-petitioners and subjected the land

to the judgments rendered for the deferred payments, and to reverse that judgment defendants appeal, insisting here upon the same two defenses, and we will dispose of them in the order named.

1. It is admitted, but if not so it is true, that defendants cannot rely on the alleged defective title under the warranty contained in the deed, since there has been no eviction and for that reason they alleged in their petition an express false representation or agreement between them and the vendors that, if the title should turn out to be imperfect, they should have the right to rescind. The husband testified somewhat positively to such an agreement both on the day of the sale, as well as on the following one on which the contract was signed. The wife was not so positive in her testimony as to that fact; but however that may be, it is proven by plaintiffs and by a number of other witnesses that when the question of title was raised on the day of the sale and before the purchase of the land at that sale, one of the plaintiffs, who was the auctioneer, and another of them who was present publicly announced the exact condition of the title and the facts creating the alleged defect, and that the alleged defect under the facts was an extremely remote one, and that the event upon which an adverse claim could be asserted was so improbable that it was almost certain that it would never occur, but that the vendors were worth at least $100,000.00 and would warrant the title and stand behind anyone who might purchase the land should the title turn out to be defective followed by any interference from any contingent adverse claimant. The court found the issue as to the agreement for the right to rescind and as to the alleged false and fraudulent representations by the vendors against defendants, and that the finding is not only supported by the evidence, but is sustained by the great preponderance of it.

It is also insisted under this ground that the vendors announced at the auction sale as a fact sustaining the title that one of the cross-petitioners, the Commonwealth Life Insurance Company of Louisville, Kentucky, held a mortgage on the land which was the one defendants agreed to assume, and said in substance that insurance companies did not take liens upon land affected with a doubtful title when, as alleged, the truth was that the mortgage referred to was taken, not by that insurance company but by a bank and which later transferred the

indebtedness as well as the mortgage to the insurance company. In disposing of that contention it first may be said that there was conflicting testimony as to whether any such representation was made, but, whether so or not, in the papers executed to the defendants the true situation was stated and we do not think that defendants are in a situation to rely on that statement even if it was a material departure from the facts so as to evidence fraud, which we are not inclined to hold. It therefore follows that we are not authorized on this appeal to interfere with the judgment for any of the reasons stated in ground (1).

2. In the very recent case of Burdon v. Seitz, 206 Ky. 336, the law in this and other jurisdictions as to the effects of by-bidding at auction sales was gone into and it was there held, under the authorities cited in the opinion, that where the vendor, or some one authorized to speak for and bind him on the subject matter, employed a strictly by-bidder who made bids at the sale, the purchaser could avoid it either by rescission, or in defense to collect deferred payments, or by refusing to perform his contract, provided of course that his subsequent actions were not such as to bar him from doing so because of laches, waiver or other recognized legal ground. Waiving the question of the existence of any such barring facts in this case and treating it as if defendants' right of avoidance was in full force and effect, the question then is, was there such by-bidding in this case as to create that right on the part of the vendees?

The undisputed facts are, that there was quite a crowd in attendance upon the sale. One of the plaintiffs acted as auctioneer, and there was in attendance one Mack Morgan, who was approached by S. G. Haselden, another plaintiff, and inquired of as to why he did not bid on the land. His answer, in substance, was that he was apprehensive of his ability to pay the probable price and using this language: "I said it was more than I felt I could take at the time, that I did not have the money and I finally said to Sam, 'If you will go half, go fifty-fifty with me, we might buy it.' He said he would, and we agreed upon the price," which was to pay as much as $235.00 per acre, and they subsequently agreed to extend that price to not exceeding $240.00 per acre. S. G. Haselden corroborates in every particular that statement. He and his brothers each testified that

the other two were not notified of that arrangement nor did they in any manner authorize it or consent to it, but that on the contrary it was the individual venture of S. G. Haselden alone. We find nothing in the record to contradict that testimony, and the only foundation for its contradiction lies in mere inference and suspicion, as is argued by learned counsel for defendant in their brief. We, therefore, feel that the question should be determined upon the hypothesis of the truth of the testimony as given by the witnesses, since although it might possibly be that the arrangement with Morgan was different from what was testified to, yet there is nothing in the record to sustain such a conclusion except surmise and suspicion and which we conclude is not sufficient to overcome the direct and express testimony that we have recited. The question then is, was the bidding by Morgan, made as agreed jointly for himself and one of the three owners, such by-bidding within the meaning of the law as to entitle the purchaser to avoid his contract?

The authorities cited in the Burdon case and others referred to therein are quite unanimous upon the point that the owner of the property sold at auction may not bid at the sale without notice given, either by the advertisement or at the sale, that the right to do so by him is reserved, and if he bids without such reservation, it constitutes by-bidding within the rule authorizing an avoidance of the contract therefor. Such bidding by the vendor is placed upon the same footing as that of a stranger who does so with the understanding and agreement that he will not be required to take the property if it should be knocked off to him, since in each case there would be no *bona fide* sale and that the bidding by both the vendor and the employed stranger would not be genuine but in the nature of a counterfeit bid and made only to deceive and stimulate the subsequent purchaser in making his offer, which constitutes the fraud lying at the basis of the rule permitting an avoidance of the contract at the instance of the purchaser.

There yet exists, however, the still further question in this case, *i. e.*, whether *one* joint owner of property offered for sale at auction may himself or in conjunction with a stranger bid at the auction sale with the *bona fide* intention of taking the property if he should be the successful bidder, and at the same time not be a by-bidder within the meaning of the law so as to entitle the subsequent purchaser to avoid the sale. In other words, does

or not the rule forbidding the owner of the property to bid on it contemplate that the bidder or bidders shall own the whole title so as that if they should be successful no one will be compelled to pay anything whatever, and the title would thereafter remain and be in the same condition as it was before the sale?

In answering that question, it might first be considered, that the reason for the rule characterizing a bid by the owner as one made by a by-bidder does not exist where one or two or more joint owners bid with the expectation of himself paying the other joint owners for the property if his bid should be accepted, since in that case he incurs a liability and will be compelled to account to his joint owners for their proportionate part of the accepted bid. He is thereby placed upon the same footing as any other *bona fide* bidder, and since the reason for the rule would not exist in that case, it would seem to follow that the rule itself would not apply. Nor do we think that the other nonconsenting joint owners would be bound by such an arrangement upon the ground of agency, since the act of the purchasing joint owner in bidding upon the property was neither intended nor purported to be for and on behalf of all, but only for and on behalf of himself. Therefore the partnership as such or the cotenants in the aggregate, who are the owners of the whole title to the property, were not bound by the action of one of them under the circumstances named, because he was neither authorized nor purported to act for the owners of the entire title; and his bid, we repeat, was not within the reason for holding the owner a by-bidder within the rule above stated.

In defining what is a by-bidder, the text in 2 R. C. L. 1128, says: "A puffer (or by-bidder), in the strictest meaning of the word, is a person who, without having any intention to purchase, is employed by the vendor at an auction to raise the price by fictitious bids, thereby increasing competition among the bidders, while he himself is secured from risk by a secret understanding with the vendor that he shall not be bound by his bids." In a subsequent part of the text on the same page, it is stated in substance that the mere fact that a person interested in the property (and who necessarily does not own or control the entire title) procures another to bid for him with the understanding that the actual bidder will not himself be required to take the property, but that the procurer will, "does not constitute such bidder

a puffer, if the one employing such bidder has not himself such control of the sale that he could absolutely release the bidder from all responsibility growing out of his having participated in the sale in that capacity.'' That statement is followed by the further one that ''If, notwithstanding such agreements, the auctioneer can hold the bidder responsible for the amount of his bid, then such bidder would not be a puffer within the meaning of the law.''

In the case of McMillan v. Harris, 110 Ga. 72, 78 Am. St. Rep. 93, in a very learned opinion rendered by the court a detailed statement of what constitutes a by-bidder is made, including the circumstances under which the owner or one interested in the property may bid without subjecting himself to the consequences of by-bidding; and the right of an interested person to make a *bona fide* bid for himself, without incurring such liabilities either upon himself or that of other joint owners or interested parties, is thus stated: ''On the other hand, the mere fact that the person is interested in the property to be sold or in the proceeds of the sale will not preclude him from either bidding himself or from procuring another to bid, either openly or secretly, in his behalf, without regard to what the agreement may be with such bidder, if the one employing such bidder has not himself such control of the sale that he could absolutely release the bidder from all responsibility growing out of his having participated in the sale in that capacity.''

Mr. Freeman, in his annotation to the case of Anderson v. Wisconsin Central Ry. Co., 107 Minn. 296, 120 N. W. 39, 131 Am. St. Rep. 462, on page 489 of the latter reference quotes with approval that statement from the Georgia opinion, and our investigation has convinced us that it embodies the universally prevalent rule upon the subject.

In this case, under the proven facts, the rights of the other two joint owners of the property could not be affected by the arrangement made between Sam Haselden and Morgan. Besides, as we have seen, the very basis of the rule forbidding the vendor to purchase is wanting in this case, since the bid by Morgan, representing himself and Sam Heselden, was a genuine one and made under such circumstances as the law may not characterize it as otherwise, but which is untrue where the owner of the entire title makes the bid or procures some authorized person to do so for him.

Independently, however, of what has been said, and of the authorities cited, to hold that one joint owner is precluded from *bona fide* bidding at an auction sale of the property, made by all of the owners with the intention and expectation of taking and paying himself to his joint owners their proportionate part, upon the ground that he would be a by-bidder, under such circumstances, would not only work a burdensome hardship upon such joint owner but would also lose sight of the reasons for the rule and apply it against by-bidding in the absence of those reasons. A joint owner might, for the purposes of division, be perfectly willing for the joint property to be sold at auction and also be both willing and anxious to own it himself and to pay whatever price he thniks it is worth. His joint owners might not be willing to accept his price and yet he might be able to buy it at the sale for less or not exceeding that sum. To deprive him of such right when exercised in good faith by himself alone and not on behalf of the others, would be carrying the principle to an unjust extreme and for which there is no sound reason to support. Of course it should be clearly proven that it was a *bona fide* effort by the bidding joint owner to purchase the property for himself with the expectation and obligation to pay for it if he was the successful bidder. We, therefore, conclude that the court did not err in holding that there was no such by-bidding in this case as to authorize the release of defendants from the obligations of their contract.

Wherefore, the judgment is affirmed.